# Richmond

CHALMERS ERWIN GIBSON v. BONNIE PEELE GIBSON.

March 6, 1967.

Record No. 6364.

Present, All the Justices.

*Ray Y. Jones* for the appellant.

No brief or argument for the appellee.

SPRATLEY, J., delivered the opinion of the court.

Bonnie Peele Gibson, complainant, filed her bill on May 7, 1964, praying that she be granted a divorce from her husband, Chalmers Erwin Gibson, for cruelty and desertion. She alleged that she and

Gibson last lived together as man and wife on May 6, 1964. She asked that the custody of their three children be awarded to her.

On May 14, 1964, Gibson filed an answer and cross-bill. In his answer he admitted that he and the complainant last lived together on May 6, 1964. He denied that he deserted Mrs. Gibson. In his cross-bill, he alleged that their separation occurred because she was guilty of cruelty towards him and of gross violation of her marital vows. He prayed for a divorce on the grounds of constructive desertion, and for the custody of their children.

On June 4, 1964, Mrs. Gibson answered the cross-bill, denied generally its allegations; but reaffirmed the allegation of her bill that Gibson deserted her on May 6, 1964.

On June 10, 1964, the Honorable Frank A. Kearney, Judge, now deceased, entered an order in which it is recited that: " * * * IT AP-PEARING TO THE COURT that the parties have lived separate and apart since the 6th day of May, 1964, * * * it is ADJUDGED, ORDERED and DECREED" that Mrs. Gibson shall have the right to remain in the home formerly occupied by the parties during the pendency of this cause, and that the three infant children of the parties, Susan Beth, age 5 years, Steven Randall, age 3 years, and William Kelly Gibson, age 3 months, remain in the temporary custody of their father. The decree further directed the payment of a fee to counsel for the complainant, the payment of court costs, and $35.00 per week for the support and maintenance of Mrs. Gibson.

The court having been advised that a child had been born to Mrs. Gibson, on March 16, 1965, an order was entered on August 6, 1965, directing the Department of Public Welfare of the City of Hampton to investigate and report to the court whether Mrs. Gibson "had begun adoption proceedings" for said child named Michael Kevin Gibson.

Numerous depositions were taken and some evidence heard *ore tenus* by the court.

On September 20, 1965, the court, the Honorable Nelson T. Overton presiding, entered a final decree in which it is recited that "* * * (I)t appearing to the Court independently of the admissions of either party in the pleadings or otherwise, * * * that the parties last resided and cohabited together in the City of Hampton, Virginia, on May 6, 1964; that a separation of the parties hereto has continued without interruption since that time; that a reconciliation between the parties is improbable, (i)t is therefore ADJUDGED, ORDERED and DE-

CREED that the Defendant, Chalmers Erwin Gibson, be and he hereby is granted a divorce *a vinculo matrimonii* from the Complainant, Bonnie Peele Gibson, on the grounds of constructive desertion, * * * and that the Bill of Complaint be and the same hereby is dismissed."

The decree awarded the custody of the three children Susan, Steven and William to Gibson, and the custody of the child, Michael, to Mrs. Gibson. It further directed that Gibson should pay unto Mrs. Gibson the sum of $40.00 per week for the support and maintenance of Michael. An additional allowance was made to counsel for Mrs. Gibson, and the case dismissed from the docket.

Gibson noted an appeal from the decree, insofar as it provided that he pay $40.00 per week for the support of the infant Michael. In his assignments of error, he contends: (1) that the above provision is contrary to the law and the evidence, and without evidence to support it; (2) that the court erred in holding that the child born March 16, 1965, was entitled to support from him, in view of the finding of the chancellor that he and Mrs. Gibson had "last resided and cohabited together on May 6, 1964;" and (3) that the amount awarded for support of the said Michael was grossly excessive.

Mrs. Gibson filed no brief in opposition to the petition of Gibson for an appeal, made no assignments of cross-error, filed no brief in the hearing before this Court, and made no appearance in person, or by counsel, on appeal, although notice was given to her and to her counsel in each instance.

Upon consideration of the evidence and the law, we granted the appeal.

The testimony of a large number of witnesses shows that the married life of the parties was marred by discord, friction and unhappiness. Much of it is in conflict as to the conduct of the respective parties. The wife testified that her husband had made false accusations against her, had assaulted her, and, finally, wilfully deserted her. The husband denied each of her charges. He testified that his wife, for several years prior to and up to the date of the separation on May 6, 1964, "kept company" with other men; that she neglected their children; and that she committed perjury in obtaining a warrant charging him with assault upon her on April 5, 1964.

The child, Michael, was born March 16, 1965, 314 days after May 6, 1964, well beyond the normal period of gestation if the last cohabitation of Mr. and Mrs. Gibson took place on or before May 6, 1964. Mrs. Gibson, in her deposition of April 28, 1965, testified, for the first

time after the institution of this proceeding, that her husband was the father of Michael; that her sexual relations had continued with Gibson "regularly" until August, 1964; that she told him she was pregnant; that they agreed to keep their cohabitation secret; that nobody knew of her pregnancy except her and her husband; and that she didn't inform her counsel or the court that she had had intercourse with her husband after May 6, 1964, and was pregnant, because her husband did not want a divorce.

When asked by counsel for Gibson if she did not testify on January 8, 1965, that she was not then pregnant, she replied: "I did not." She further said, "When we were in Court and Mr. Jones (counsel for Gibson) asked me that—if I was pregnant, I didn't know then." Later she said, "I knew I was, but I had not gone to a doctor." She then said she knew in August, 1964.

Gibson testified that he had not had sexual intercourse with Mrs. Gibson since May 6, 1964; that he did not know that she had become pregnant after that date; that he had never seen the child, Michael; and did not know that he had been born. Moreover, there is no evidence in support of Mrs. Gibson's testimony that she and her husband had continued their marital relations after their separation on May 6, 1964.

Witness after witness testified that Mrs. Gibson frequently associated with male companions in the nighttime, both before and after May 6, 1964, and during the period in which the conception of a child born on March 16, 1965, would have normally occurred.

On January 8, 1965, Mrs. Gibson, at a hearing in open court, held at her request, declared "I'm not pregnant. Why do you ask me that?" Counsel for her husband moved the court to order a medical examination of her to determine whether or not she was pregnant; but the motion was denied.

On September 24, 1965, the Department of Public Welfare reported to the court that it had been unable to ascertain whether Mrs. Gibson had made arrangements to place Michael for adoption. It reported that at his birth on March 16, 1965, Michael weighed eight pounds and three ounces.

The pleadings and evidence show that Mrs. Gibson, prior to the birth of her infant son, Michael, relied on the allegations of her bill of complaint, and in her answer to her husband's cross-bill, that she and Gibson "last lived together as husband and wife" on May 6, 1964; and that less than two months and a half before the birth of Michael,

she denied that she was pregnant; and that she did not inform either her attorney or the court that she had resumed marital relations with her husband after she instituted this suit.

Here, the chancellor, who had the opportunity to observe the parties when they appeared before the court, after consideration of all the evidence, resolved the contradictions in favor of the husband. We think the evidence sufficient to support the finding that the parties last lived together as husband and wife on May 6, 1964. It is difficult to believe the testimony of the wife, in view of her conduct and self-contradiction. The husband should not, and would not, have been granted the divorce if the fact that he had resumed marital relations with his wife subsequent to the institution of this proceeding, had been brought to the attention of the judge.

A presumption of law exists in favor of the legitimacy of a child born in wedlock; but the presumption may be rebutted by other testimony. Improbability of known access by the husband merely of itself is not sufficient to repel the presumption; but when the evidence forces the conclusion of non-access beyond all reasonable doubt, it is sufficient to repel the presumption. 3 Mich. Jur., Bastardy, § 7, page 132; 10 C. J. S., Bastards, § 3, pages 25 et seq., § 5(a), pages 30, 31; 10 Am. Jur., 2d, Bastards, § 15, page 855.

If it had been established that the husband and wife had engaged in sexual intercourse after the institution of this divorce proceeding, a decree of divorce should have been refused, with or without a plea of condonation. Tarr v. Tarr, 184 Va. 443, 449, 35 S. E. 2d 401.

In Anderson v. Anderson, 196 Va. 26, 29, 82 S. E. 2d 562, we said: " * * *, (I)f the parties occupy the marital bed, the continuity of the 'separation without interruption' is destroyed. The separation referred to in the statute is the same as that required to be proved as one of the elements of desertion in an original suit for an absolute divorce and must be continuous and without interruption. * * *."

Wherever it is sought by the wife to prove that during the pendency of the divorce action, there had been sexual relations with her husband, the proof of such cohabitation and condonation rests upon her, upon the principle that who alleges fraud has the burden of proving it by evidence which is clear and convincing. Cf. Ware v. Ware, 203 Va. 189, 123 S. E. 2d 357.

In Virginia the following reported cases deal with the presumption of legitimacy of birth:

In Bowles v. Bingham, (1811) 2 Munf. (16 Va.) 442 and 3 Munf.

(17 Va.) 599, it was held that a husband's declarations that a child born in wedlock was not his were insufficient to prove the child illegitimate; notwithstanding the child was born only three months after the marriage, and a separation between him and his wife had taken place soon thereafter by mutual consent.

In *Watkins and wife* v. *Carlton*, (1840) 10 Leigh (37 Va.) 560, the presumption was overcome where the husband and wife were white persons, and the child born to the wife was a mulatto.

In *Smith* v. *Perry*, (1885) 80 Va. 563, where the child was born before the marriage of the husband and wife and reared as a son of their own, and the next of kin of the child on his mother's side did not set up a claim of illegitimacy until after the child's death, in order to succeed to his property, the presumption of legitimacy was not overcome.

In *Scott* v. *Hillenberg*, (1888) 85 Va. 245, 7 S. E. 377, where the husband recognized the child as his, and the impossibility of procreation was not established, the presumption was not repelled.

In the case before us, there is no evidence that Gibson stood in a position of *in loco parentis*. He never had seen the child, and did not know when and where the child was born. Furthermore, as noted, the court held that Gibson did not have access to his wife after the institution of this proceeding.

Cases from other jurisdictions hold to the same effect. They demonstrate the rule that the presumption of legitimacy of a child born during the marriage period can be overcome, if sufficient evidence is presented. Cf. *Pilgrim* v. *Pilgrim*, (1947) 118 Ind. App. 6, 75 N. E. 2d 159; *Magarell* v. *Magarell*, (1950) 327 Mich. 372, 41 N.W. 2d 898; *Collins* v. *Collins*, (1949) 195 Misc. 119, 89 N. Y. S. 2d 252; *Schilcher* v. *Schilcher*, (1938) 124 Conn. 445, 200 A. 351.

For the reasons stated, the decree appealed from is affirmed insofar as it dissolves the bonds of matrimony between the parties; but reversed and set aside insofar as it orders the appellant, Gibson, to pay to Mrs. Gibson money for the support of the child, Michael.

*Affirmed in part and reversed in part.*